SLANSKY, APPELLEE, *v.* SLANSKY, APPELLANT.

[Cite as Slansky v. Slansky (1973), 33 Ohio App. 2d 127.]

(No. 31503—Decided January 18, 1973.)

*Messrs. Sharrat & Willmann,* for appellee.

*Messrs. Palmquist & Courtney* and *Mr. Donald J. Shell,* for appellant.

JACKSON, J. This appeal presents the question of whether a wife may avail herself of an action in forcible entry and detainer to exclude her husband from the marital dwelling.

In 1971, Laura Slansky, plaintiff appellee, brought this suit in Berea Municipal Court to oust Robert Slansky, the appellant, from the house which they had shared as husband and wife until 1967. The complaint alleged that the appellant had "entered upon . . . [the] premises as the husband of the plaintiff and has failed to pay rent to plaintiff in any amount whatsoever while occupying said premises." However, the appellee introduced no evidence of any rent or lease agreement between the parties, and it is apparent from the arguments and evidence presented at trial that Mrs. Slansky based her claim upon the fact that she held title to the property.

The testimony of the parties instead focused almost entirely upon the history of their martial relationship and upon the ownership aspects of the property in dispute. The record discloses that the property was acquired during the parties' marriage, sometime between 1941 and 1942. Mrs. Slansky testified that the lot was purchased with funds received for the death of one of their children, although she did not elaborate on whether this money was originally paid to her, or her husband, or to both. The plaintiff wife testified that she and her husband built the house over a long period of time with the money for materials being derived from their respective employment with the National Carbon Corporation, and this testimony was not contradicted. However, appellant husband admitted that title to the property was vested in the name of his wife.

It is evident that the marriage relationship between the parties has not been characterized by harmony and tranquillity. The record does not disclose the date of their marriage, but it appears from the testimony that the Slanskys were first divorced in 1949. This, however, did not have much of an impact upon the parties for they continued living together as man and wife, eventually bearing two children. However, in 1967 their marriage again ran aground. Prompted by a domestic quarrel and by the generally uninhabitable conditions of the house,[1]

---

[1]Among other things, the wife complained that there was no bathroom and that the upstairs was unfinished. She also testified that they had to wash the dishes in contaminated well water.

Mrs. Slansky moved out. She filed a divorce action against her husband shortly thereafter, but the divorce was denied. Since 1967, the appellant has remained in the marital dwelling while the appellee has lived elsewhere. At trial both parties regarded themselves as being married to one another, and for the purposes of the case we assume that the parties were still legally married at the time this action was brought.

At the conclusion of the evidence, the court found the husband guilty of unlawfully detaining the premises and ordered restitution. The appellant has appealed this judgment, assigning as error that the judgment is contrary to law; he argues that the Municipal Court did not have jurisdiction over this controversy by virtue of R. C. 3103.04.[2]

Hardly a paragon of legislative draftsmanship, this statute does not specifically preclude a Municipal Court from effecting spousal exclusions from the marital dwelling through a forcible entry and detainer action. Yet, the historical evolution of this enactment, when examined in relation to the experience of other jurisdictions in coping with the same problem, has persuaded this court that appellant's contention has merit. The Berea Municipal Court should have dismissed this case for lack of jurisdiction.

R. C. 3103.04 is part of a compendium of legislation constituting Ohio's Married Women's Act.[3] As the Nineteenth Century precursor of today's women's liberation movement, this Act was part of a national campaign to sweep away the common law web of limitations and disabilities which had entangled a married woman's rights to own and dispose of property, to make binding contracts, and to sue and be sued in an individual capacity. With respect to real property, the restrictions had been particularly severe. For all practical purposes, the husband became the owner of the wife's realty solely as an incident of mar-

---

[2]"Neither husband nor wife has any interest in the property of the other, except as mentioned in R. C. 3103.03, the right to dower, and the right to remain in the mansion house after the death of either. *Neither can be excluded from the other's dwelling, except upon a decree or order of injunction made by a court of competent jurisdiction.*" (Emphasis supplied.)

[3]84 Ohio Laws 132 (1887).

riage. He was entitled to the possession, control and use of her land, and he could additionally claim the rents and profits derived therefrom.[4] It has even been suggested that while the husband could not sue the wife in ejectment or trespass, he could oust her from their property, her only recourse being that she could pledge her husband's credit for necessaries.[5] Like its counterparts in other states, the Ohio Act remedied these fundamental inequities by explicitly creating the legal right of a married woman to hold and dispose of her own separate property and by abolishing for the most part the husband's legal interests in her property.[6] But this Act stood apart from the others in that it flatly prohibited the exclusion of either spouse from the

[4]*Lessee of Thompson's Heirs* v. *Green* (1854), 4 Ohio St. 216, 222-23; *Levi* v. *Earl* (1876), 30 Ohio St. 147, 163-64, *overruled on other grounds, Williams* v. *Urmston* (1880), 35 Ohio St. 296; *Denny* v. *McCabe* (1880), 35 Ohio St. 576, 578.

[5]*Bendall* v. *McWhirter* (1952), [1952] 1 All E. R. 1307, 1310 (C. A.); cf. *Lessee of Thompson's Heirs* v. *Green* (1854), 4 Ohio St. 216, 225, which noted the husband's "exclusive right of possession" and the fact that "the wife . . . had no right of possession as against her husband."

[6]This Act, of course, cannot be credited with being the first Ohio legislation to adjust this common law imbalance between husband and wife. Well before 1887 the legislature demonstrated an increasing commitment toward establishing equality in the areas of property law. contract law, and civil procedure. See, *e. g.,* Act of 1846, 44 Ohio Laws 75 (wife's real property could not be taken to satisfy her husband's obligations during the lifetime of herself or her children, nor could it be conveyed by him unless the instrument of conveyance was executed or acknowledged by her); Act of 1861, 58 Ohio Laws 54 (designated any real property belonging to a wife as her "separate property" subject to "her sole control," and, as construed by *Hershizer* v. *Florence* (1883), 39 Ohio St. 516, 529, "stripped the husband of his right to possession and to rents and profits of his wife's lands"); Act of 1866, 63 Ohio Laws 47 (enlarged power of married woman to make binding contracts with reference to her separate property); Act of 1884, 81 Ohio Laws 65 (married woman could sue and be sued as if unmarried). Nor did the Married Women's Acts as a whole represent the first efforts to secure for the wife the unfettered prerogatives of ownership over chattels and land. During the preceding centuries, the courts of equity sanctioned the use of the trust to shield the property of a married woman from the blatant injustices which inevitably arose as a result of the husband's unchecked legal rights to it. A settlor had only to transfer the property in trust, with the provision that the *res* was

other's dwelling and was broad enough to include exclusions that were the result of self-help as well as those secured through judicial relief.[7]

The reasons which actually motivated the legislature to engraft this severe limitation on not only the wife's newly fashioned right to own and control property but also on the more ancient correlative rights of the husband have, of course, been lost in time.[8] One plausible explanation is

to be held for the sole and separate use of the wife, free from the use and control by the husband. As to this equitable separate estate, a married woman was regarded as feme sole, having the rights to rents and profits, the rights to contract and sue with reference to it, and the power of disposition. Of course, the inherent shortcoming of the equitable estate concept was that it could not be employed to protect property which was not transferred to the woman expressly in trust for her sole and separate use. In addition, because of the expenses incident to the administration of a trust, this device was actually a luxury, available only to those with considerable wealth. It was these inadequacies, plus others, that probably gave impetus to the passage of the married women's legislation.

[7]"Neither husband nor wife has any interest in the property of the other, except as mentioned in sections 3110 and 4188, but *neither can be excluded from the other's dwelling.*" 84 Ohio Laws 132 (1887). (Emphasis added.)

This statute was apparently modeled after a section appearing in a proposed civil code for the State of New York:

". . . neither husband nor wife has any interest in the property of the other, but neither can be excluded from the other's dwelling." Field's Draft, N. Y. Civil Code Sec. 78 (1865).

According to an accompanying report, the Civil Code was drafted by a Board of Commissioners under the auspices of the New York Legislature. Their task was "to reduce into a written and systematic code, the whole body of the law of this State, or so much and such parts thereof as to the said Commissioners shall seem practicable and expedient," in addition to which they were to "specify such alterations and amendments . . . as they shall deem proper." *Id.* at xi, quoting in part from enabling legislation. The proposed code, however, met strong opposition and never was enacted. Field, The Civil Code: What It Is; And Why It Should be Adopted, 25 Albany L. J. 218 (1882). Interestingly enough, in 1872, California did adopt this Code, including the provision on spousal exclusions. *Id.*; see Calif. Civ. Code Sec. 5102 Legislative History (Deering 1972).

[8]This in large measure is due to the failure of the General Assembly to maintain public records of its hearings and reports on legislation, thus depriving the judiciary of one of the indispensable sources needed to interpret statutes.

that the General Assembly was unfavorably influenced by the New York experience with spousal exclusions prior to 1887. Two decisions stand out. In *Minier* v. *Minier,*[9] a married woman brought an ejectment action against her husband to recover possession of a home owned by the wife and previously used as the marital dwelling. The husband had apparently driven the spouse out of the home. In construing the New York Act, the court held that ''[i]n regard to the property, the relation of husband and wife does not affect it; as the parties are strangers to each other,''[10] and on this basis affirmed the judgment for the wife. Subsequently, in *Wood* v. *Wood,*[11] the high court of New York reached the same result in an almost identical fact situation as in *Minier*. Property had been conveyed to the wife for life for her sole and separate use. The property also had been occupied as the marital dwelling, but, by reason of the husband's conduct, the wife left. She eventually filed an ejectment action to remove the husband and restore herself to possession. In applying the married women's act, the court held that the husband had no legal or equitable interest in the property and by virtue of her title in the land the wife was entitled to sole and absolute possession.

The New York courts cannot be faulted for attempting to follow the unqualified language of that state's Married Women's Act. But it may be argued that a price was paid for vindicating the wife's legal interest in the marital dwelling. For the family home represents more than a bundle of property rights and privileges which the owner is entitled to assert against the rest of the world. Beyond its more primitive function of sheltering the husband and wife from the physical elements, it ideally provides the requisite sanctuary in which a marriage relationship can take root and grow. It has been said that in marriage a husband and wife acquire a personal as well as a legal right to each other's conjugal society.[12] The marital home offers

---

[9](N. Y. Sup. Ct. 1870), 4 Lans. 421.
[10]*Id.* at 422.
[11](1881), 83 N. Y. 575.
[12]*Westlake* v. *Westlake* (1878), 34 Ohio St. 621, 634.

a place wherein spouses may enjoy each other's society as they meet their obligations of mutual respect, fidelity and support.[13] Where a spouse is denied access to the matrimonial home, as was the result in the cases discussed above, these rights and obligations are invariably disturbed. The Ohio Legislature may very well have believed that these marital rights were entitled to just as much protection as the property rights in the home and that the most effective means to accommodate them as they converged in the dwelling was to prohibit exclusions entirely.

Attributing such a belief to the legislating body is not unreasonable. Just nine years preceding the passage of the Ohio Act, in the seminal case of *Manning* v. *Manning*,[14] the North Carolina Supreme Court warned of the disruptive impact which spousal exclusions might have upon marriages. Relying upon her rights under that state's Married Women's Act, the wife had brought an ejectment action against the husband to recover possession of her land which he had assumed control and from which he had been appropriating the rents and profits. While the court upheld the granting of a writ of possession, thus restoring the wife's occupancy and control over her lands, it notably ordered modification of the writ so as not to eject the husband from the premises. As ground for this unprecedented action, the court observed:

"The plaintiff [wife] is entitled to be let into the possession of her lands, and in a legal sense, the sole and exclusive possession. That will not impair the husband's marital right of occupancy, the right of ingress and egress to her dwelling and society, to live with her and to tread upon her domains. She is entitled to be put in possession, if she has been excluded, but not by expelling him. The possession of the husband is not like that of a stranger, adverse to the wife, but in law consists with it; and if the bad conduct of the husband has disturbed that relation, the law steps in, not to destroy, by his expulsion, but to re-

---

[13]See R. C. 3103.01, which provides that "[h]usband and wife contract towards each other obligations of mutual respect, fidelity, and support."

[14](1878), 79 N. C. 293, 28 Am. R. 324.

store harmony and unity of the relation to the status established by marriage.'"[15]

To deny the husband this right, the court fearfully prophesied, would have a far-reaching and detrimental impact on marriage as an institution and, in turn, on the stability of our social and political system.[16]

---

[15]79 N. C. at 299. *Accord, State* v. *Jones* (1903), 132 N. C. 1043, 1044-45, 43 S. E. 939, 940; *Walker* v. *Long* (1891), 109 N. C. 510, 512, 14 S. E. 299, 300. Similar expressions of the marital right of occupancy may be found in *Edmonds* v. *Edmonds* (1924), 139 Va. 652, 660, 124 S. E. 415, 417; *Owens* v. *Owens* (Ch. 1958), 37 Del. Ch. 337, 343, 143 A. 2d 123, 127, *rev'd* (Sup. Ct. 1959), 38 Del. Ch. 220, 149 A. 2d 320; *Shipman* v. *Shipman* [1924], 2 Ch. 140, 146 (C. A.) (Atkin, L. J.). Cf. *Rosenstiel* v. *Rosentiel* (1963), 20 App. Div. 2d 71, 76-77, 245 N. Y. S. 2d 395, 398; *McKaig* v. *McKaig* (1935), 154 Misc. 257, 258-59, 276 N. Y. S. 829, 831, both of which cases implied a wife's right to possession of the marital home, notwithstanding the husband's ownership, on the latter's duty to support the former.

[16]"Any decision of the courts, the direct or incidental result of which is to destroy the sanctity of marriage in that particular, can but weaken and undermine the surest foundation upon which the structure of society, and through it, our political institutions rest, and command our confidence." 79 N. C. at 298-99. This, of course, is not a unique nor uncommon policy argument, but has been embraced to justify many other rules governing the legal relations between husband and wife. For example, in reaffirming the common law rule that spouses living together may not maintain negligence actions against one another, an Ohio Court of Appeals stated:

"While the common-law unity of person in the husband and wife no longer prevails, nevertheless the marriage ceremony does constitute a new relationship whereby the parties assume a different responsibility toward each other and toward society. As husband and wife, there is at least a unity of interest in the establishment of a home. The home has been looked upon as constituting the basis of our civilization and the strength of our government. Love of home is regarded as the greatest safeguard of our institutions. The growing volume of divorce cases is cause for apprehension as to the future of our domestic stability. It would seem that any policy that may add to the causes for dissension between husband and wife would be of doubtful benefit. The intimate relations of home life might easily become the source of fruitful litigation. Shall a misplaced chair over which husband or wife falls furnish the grounds for an action against the other because of his or her alleged negligence?" *Finn* v. *Finn* (Lucas County 1924), 19 Ohio App. 302, 306-07.

The early version of R. C. 3103.04, with its unqualified language, remained in effect for over thirty years. Then, in 1919, it was amended to include the present provision giving "courts of competent jurisdiction" the power to exclude either a husband or a wife "upon a decree or order of injunction."[17] Again, we are without evidence of the motivation prompting the legislature to carve this exception or to choose injunctive relief as the sole means of effecting spousal exclusions. Conceivably there was concern that a literal interpretation of the original statute would preclude a court from ejecting a spouse in those circumstances which might warrant such relief, such as protection from physical violence. Moreover by 1919 the use of injunctions for this purpose was not a novel practice, but had been tried and tested both outside and within the borders of Ohio.[18] In any event, by limiting the available relief to injunctions the legislature effectively restricted review of this type of problem to the court which had the expertise to handle questions involving domestic relations, namely, the common pleas court. That court alone has been granted jurisdiction over domestic affairs, including divorce and alimony, and general jurisdiction to grant injunctions.[19]

---

[17]108 Ohio Laws 606 (1919).

[18]See *Wilson* v. *Wilson* (Ohio Sup. Ct. 1832), Wright's R. 128; *Johnson* v. *Johnson* (Ohio Sup. Ct. 1833), Wright's R. 454; *Symonds* v. *Hallett* (C. A. 1883), 24 Ch. D. 346.

[19]See R. C. 3105.01, .18; 2727.03. It may have been more than a coincidence that a few years prior to the 1919 amendment, the legislature, responding to recommendations that jurisdiction over the wide range of disputes involving family life should be consolidated in a special tribunal, passed the first acts creating Domestic Relations Courts in various counties. 107 Ohio Laws 721, 703 (1917); 106 Ohio Laws 424 (1915); 104 Ohio Laws 176 (1914). For a discussion of these courts, see II C. Marshall, A History of the Courts and Lawyers of Ohio 457-63 (1934). Today these courts are provided for in R. C. 2301.03 as a division of the court of common pleas in a number of counties. Furthermore, our conclusion that the common pleas court, or its domestic relations division, has exclusive jurisdiction over this matter is buttressed by persuasive precedent from another state. In a strikingly similar New York case, a husband filed in that state's court of general jurisdiction a summary, real property action to have the

Although the right to exclusive possession has always been a significant aspect of property ownership[20], that right, like any other, may at times be exercised capriciously and arbitrarily absent legal or equitable limitations. The marriage relationship unfortunately presents an opportunity for such abuse. Human experience teaches that marriage is not without its own internal tensions and stresses, which at times may overcome mature judgment. An unkind remark, a misdirected burst of anger, a thoughtless gesture —any one of these may be a sufficient catalyst to unleash a vituperative torrent of pent-up anxieties and frustrations. It is during these moments of emotional fury—when a couple may be prompted to say or do things to one another which they ordinarily would consider unthinkable— that one spouse may vent his or her anger by resorting to the legal process to oust the other from the marital domicile. Of course, the impact of such action can be extremely severe and sometimes irreversible. The point need not belabored that no marriage can long survive where the husband and wife are prevented from living together. The

wife evicted from the home. But, like Ohio, New York by that time had established the Family Court. As one ground for reversing the lower court's order of eviction, the appellate division observed:

"Statutory enactments purporting to cover certain rights and obligations of a husband and wife, one to the other, and the civil remedies available with respect thereto have been codified in the Domestic Relations Law, the CPLR and the Family Court Act, and thereby the general jurisdiction and responsibility in this field have been committed to the Supreme Court and the Family Court which are properly fitted and equipped to handle the myriad of problems which may arise out of a family relationship. The use and possession of the family home is so essentially a part of the jurisdiction and responsibility of such courts in family matters that, had the legislature intended to confer upon other courts jurisdiction over such use and possession, it is clear that it would have made its intent in this regard plainly known." *Rosenstiel* v. *Rosenstiel*, 20 App. Div. 2d 71, 73-74, 245 N. Y. S. 2d 395, 398 (1963). The court held that the husband could not avail himself of the summary eviction statute to remove the wife from the home.

[20]*Village of East Rochester* v. *Rochester Gas & Elec. Corp.* (1943), 289 N. Y. 391, 399, 46 N. E. 2d 334, 338; Restatement of Property Sec. 7 (1936).

effect of R. C. 3103.04, and its predecessor, however, is to stave off such drastic action. While the overall purpose of the Married Women's Act was to make the wife's property rights relatively contiguous with those of the husband, R. C. 3103.04 limits their respective rights so that neither spouse can effect a separation, revengeful or otherwise, simply because one has full title to the marital dwelling house. To this extent, the statute serves to protect the marriage. To be sure, we do not intend to imply that R. C. 3103.04 can prevent marital discord or avoid a voluntary separation and thus we think that the laudable policy considerations which persuaded the court in *Manning* v. *Manning, supra,* to restrict spousal exclusions, may be somewhat divorced from reality. By the time a spouse avails himself or herself of legal process to effect an exclusion of the other, the marital relationship may be already strained beyond the breaking point. But if that is indeed the case, surely the common pleas court, with its experience in family affairs and its broad equity powers, is the most appropriate forum for hearing the matter. It offers a greater opportunity to bring about a more just resolution of a particular marital dispute, taking into account the interests of all members of the family. As this case ably demonstrates, a contrary holding would allow spousal exclusions in summary proceedings in courts of limited remedial powers. Here the only issue cognizable in the proceeding below was who had right to immediate possession and the only available relief was restitution to the exclusion of the appellant.

Counsel for appellee attempts to bring this case within the exception clause of R. C. 3103.04 by arguing that a ''decree'' means any judgment of any court, including a judgment in a forcible entry and detainer action brought in a municipal court. This argument rests upon the assumption that the word ''decree'' is to be construed separate and apart from the phrase ''order of injunction,'' which immediately follows that term. However, counsel has ignored the significant fact that ''decree'' is a generic term which has historically referred to judgments of a

court of equity, as opposed to those of a court of law.[21] Moreover, the terms "decree" and "order" are not so unrelated as the appellee contends. Both refer to rulings of the court. But, on the one hand, a "decree" has been held to describe any final (equitable) judgment which determines the rights of the parties and announces the legal consequences of the suit. On the other hand, an "order" has been defined to mean only an interlocutory or temporary ruling which does not decide the case, but only resolves an intervening matter. Thus, the distinction is one of finality.[22] In light of the fact that an injunction is an equitable remedy which may be granted either provisionally as an "order" or with finality as a "decree," we are unable to agree with the appellee's open-ended construction of R. C. 3103.04 which would allow any court in any given cause of action to exclude a spouse from the marital dwelling. Clearly, this statute contemplates injunctive relief as the only means for perfecting the exclusion of a spouse.

As an alternative route for circumventing the provisions of R. C. 3103.04, the appellee presses for a narrow construction of the term "dwelling" as it appears in the prohibitory clause of this statute. She argues that the term "dwelling" should be defined only in reference to whether the parties were still living together as husband and wife when the action was filed. Since she has been unilaterally separated from her husband for the last three years, it is her contention that the house in question is no longer a marital dwelling within the purview of the statute. However, we believe that such an argument

---

[21]See *Stuckey* v. *New York, C. & St. L. R. R.* (Allen County, 1937), 58 Ohio App. 14, 15; *Alford* v. *Leonard* (1925), 88 Fla. 532, 546, 102 So. 885, 890; *In re Evening Journal Ass'n* (1949), 1 N. J. 437, 444, 64 A. 2d 80, 83; Ohio R. Civ. P. 54, Staff note; 1 A. Freeman, Treatise of the Law of Judgments Sec. 12 at 23 (5th ed. 1925). *But cf. Mansfield* v. *Cole* (C. P. Cuyahoga County, 1914), 16 Ohio N. P. (n. s.) 209, 219.

[22]*People ex rel. Earle* v. *Circuit Court of Cook County* (1897), 169 Ill. 201, 215, 48 N. E. 717, 722; *Ruprecht* v. *Ruprecht* (1959), 255 Minn. 80, 89, 96 N. W. 2d 14, 22; *In re Kennedy's Estate* (Sur. Ct. 1935), 156 Misc. 166, 167, 281 N. Y. S. 278, 279.

opens the door to complete emasculation of the statute and therefore we reject it. If the "dwelling" as it appears in R. C. 3103.04 were held to be a function of the time of separation, then a spouse could completely circumvent this section by simply moving out for a judicially prescribed length of time prior to filing a property action at law, completely bypassing the prescribed avenue of injunctive relief.[23]

Although we conclude that municipal courts have to determine cases in forcible detainer, they are without jurisdiction to determine domestic relation cases and may not determine that one or the other may be excluded from the marital home pursuant to R. C. 3103.04.

For the reasons heretofore mentioned, we find that the trial court committed error prejudicial to the appellant and, accordingly, we reverse the judgment of the Berea Municipal Court and enter final judgment for the appellant.

*Judgment reversed.*

SILBERT, P. J., concurs.

KRENZLER, J. dissents. I respectfully dissent from the majority opinion in this case.

---

[23]For this same reason we cannot accept the contention that the term "dwelling" must be defined in terms of where a plaintiff spouse happens to be residing at the time judicial relief is sought. This operative definition, like the construction proffered by the appellee, would permit a spouse who owns the marital dwelling to evade the prescriptions of R. C. 3103.04 by simply leaving it and living elsewhere. To be sure, a place where one lives and resides might aptly be described as a dwelling. But this court must give meaning and moment to statutory language in light of the purposes and policies behind a given statute. *Humphrys* v. *Winous Co.* (1956), 165 Ohio St. 45, 49. In this regard, it is useful to note what one authority has observed about judicial interpretations of "dwelling" as it was used in a particular statute and in a private deed:

" 'Dwelling house' is a very flexible term. Its meaning depends not only on content, but on *the determination of the courts not to permit public policy or justice to be defeated by a word.*" Black's Law Dictionary 596 (4th ed. 1951). (Emphasis added.)

If the policies behind R. C. 3103.04 are not to be undermined, the interpretations asserted above and by the appellee must be denied.

It is undisputed that the plaintiff and defendant are wife and husband, respectively, who lived in a single family residence at 16562 Boston Road, Strongsville, Ohio. Title to the property is in the name of plaintiff wife, who moved out of the subject premises in October, 1967. The defendant husband continued to live in the house after the plaintiff moved out and the parties have lived separately since that time. Plaintiff filed a forcible entry and detainer action against the defendant in the Berea Municipal Court on October 3, 1971, and has complied with all of the procedural requirements of R. C. Chapter 1923.

There is no divorce or alimony action pending between the parties.

The defendant raised two principal defenses, and neither is valid.

(1) The husband has the right to choose the marital home and the wife is under a duty to live with him, pursuant to R. C. 3103.02.

(2) The Berea Municipal Court has no jurisdiction to hear the forcible entry and detainer action because R. C. 3103.04 states that neither the husband nor wife can be excluded from the other's dwelling except upon a decree or order of injunction made by a court of competent jurisdiction.

It is noted that the defendant did not make a claim or enter a defense that he has an equitable interest in the property or that the plaintiff is holding the property in trust for him. Consequently, how title to the property was acquired by the plaintiff is not an issue in this case and need not be discussed.

At the conclusion of all the evidence the trial court properly held that the only issue before the court was the right of possession, and judgment was entered for the plaintiff and a writ of restitution issued.

It is noted that a municipal court has jurisdiction in a forcible entry and detainer action, provided for in R. C. Chapter 1923 (R. C. 1901.18(A) and (H)), and the only issue to be determined is the right of possession. *Haas* v. *Gerski* (1963), 175 Ohio St. 327; *Kuhn* v. *Griffin* (1964), 3 Ohio App. 2d 195.

The issues raised in this appeal require an answer to the question as to whether a wife, who owns property and is separated from her husband and has not lived with him for a period of four years, can maintain a forcible entry and detainer action against her husband who continues to live in her house.

I believe that under the facts in this case the plaintiff can prevail in a forcible entry and detainer action. There is no body of law which would require an opposite conclusion. There is no valid legal reason why a wife who owns property should be discriminated against and treated differently from any other property owner because it is her husband whom she proposes to evict from the premises, when they are not living together as husband and wife.

It is maintained that there is a body of law that precludes the plaintiff from prevailing in this action. I disagree with this conclusion.

R. C. Chapter 3103 concerns itself with the relationships between a husband and wife. It provides in substance that the husband is the head of the family, that he must support himself, his wife and his minor children, that he may choose any reasonable place or mode of living, and the wife must conform thereto. R. C. 3103.02 and 3103.03.

There is no question that the husband has the right to select the domicile and it is the duty of the wife to follow him, and if she does not he may be relieved from supporting her. However, this does not require that her separate property must be used for the domicile of the family, especially if she refuses to live there. He must have a legal right to live in the place which he calls the marital home.

There is nothing in these sections that requires a wife to live with her husband if she chooses to separate from him and live elsewhere. Her refusal to live in a reasonable place that he may choose could deprive her of obtaining support from him, or be grounds for a divorce. R. C. 3105.01(B). But this does not take away any of her rights as a property owner. *Morse* v. *Lewis* (1921), 15 Ohio App. 108; *Hardy* v. *Smith* (1920), 13 Ohio App. 399; *Slusser* v. *Slusser* (1952), 68 Ohio Law Abs. 7.

The defense that the plaintiff cannot maintain this

action because a husband has the right to choose the marital home and the wife is under a duty to live with him, pursuant to R. C. 3103.02, is not well taken.

We will now turn our attention to the second defense raised by the defendant, and that is whether R. C. 3103.04 would preclude the plaintiff from prevailing in this action.

Many years ago married women's acts were adopted by Ohio and other states, which gave married women the right to own property independent of their husbands. These laws changed the common law rule that a husband and wife were one, and gave the wife her independence. The aim of the married women's act is the emancipation of the wife from her common law subordination in order to create equality of the spouses. *Damm* v. *Lodge* (1952), 158 Ohio St. 107.

Ohio law provides that a married person may take, hold and dispose of property, real or personal, the same as if unmarried, and neither husband nor wife has an interest in the property of the other (except as provided for in R. C. 3103.03, and except the right to dower, the right to remain in the mansion house after death of either). R. C. 3103.04 and 3103.07.

Further, neither can be excluded from the other's dwelling except upon a decree or order of injunction made by a court of competent jurisdiction. R. C. 3103.04. Defendant claims that the foregoing language in R. C. 3103.04 precludes the plaintiff from excluding the defendant from the premises without a decree or order of injunction made by a court of competent jurisdiction because it is the plaintiff's dwelling.

The proposition that a home once used as a "dwelling" by the owner is always the owner's "dwelling" is not valid. What is meant by a "dwelling" under R. C. 3103.04 must be determined under the facts and circumstances in each case. In the present case the plaintiff moved out of her dwelling in October, 1967, and had not lived there for four years before instituting the forcible entry and detainer action. Clearly, the subject premises is not her dwelling as provided for in R. C. 3103.04. Further, we are not dealing

with a case wherein the owner-wife moved out of her dwelling one day and brought a forcible entry and detainer action the next day. Fraud was not perpetrated on the court by the plaintiff bringing this action.

R. C. 3103.04 is not applicable because under the facts in this case plaintiff is not attempting to exclude the defendant from her dwelling, because the subject premises are not the dwelling of the plaintiff. A dwelling is a place of habitation, abode, residence, domicile. It is a place where one lives. Black's Law Dictionary, Fourth Edition, 1951; Webster's New International Dictionary, Second Edition, 1942.

There is no law to compel a wife to live with her husband on her land or on his. There is no legal prohibition upon her separating from him and living apart, and having separated from him and having left her home in his possession, she is entitled to recover it from him as if he were a stranger. To hold otherwise would be to give the husband rights and estates in the wife's lands which our statutes not only do not provide for but expressly provide against. See *Owens* v. *Owens* (1959), 38 Del. Ch. 220, 149 A. 2d 320; *Hall* v. *Hall* (1951), 193 Tenn. 74, 241 S. W. 2d 919; *Cook* v. *Cook* (1900), 125 Ala. 583, 27 So. 918; *Buckingham* v. *Buckingham* (1890), 81 Mich. 89, 45 N. W. 504.

If a forcible entry and detainer action were not available to the plaintiff in this case, she would be required to file a divorce or alimony action in the Common Pleas Court in order to obtain an order or decree of injunction to exclude the defendant from the subject premises.

There is no support in Ohio law for the proposition that a spouse who owns property cannot maintain a forcible entry and detainer action against the other spouse if such property had once been used as the dwelling of the spouse who owns the property, and that the owner-spouse is required to file a divorce action or alimony action in order to remove the other spouse from the owner-spouse's property. The effect of such a holding would divest Municipal Courts of jurisdiction in all forcible entry and detainer actions by an owner-spouse against the other spouse. The

Ohio Legislature did not state that Common Pleas Court jurisdiction over domestic affairs deprives Municipal Courts of jurisdiction in forcible entry and detainer actions between spouses.

It is recognized that marital harmony shall be promoted and courts not used to facilitate a breakup of the family. However, denying the plaintiff her legal right to maintain a forcible entry and detainer action would not contribute to that philosophy.

The trial court properly granted judgment for the plaintiff and issued a writ of restitution. The judgment of the trial court should be affirmed.